UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>— against —<br><br>STEFISHA MILLER,<br><br>Defendant. | 18-cr-202 (ARR)<br><br>**Opinion & Order**<br><br>**Not for electronic or print publication** |

ROSS, United States District Judge:

On September 21, 2018, defendant Stefisha Miller submitted motions *in limine* to admit defense theory evidence and preclude argument and expert testimony by the government. *See* Def. Mot. in Lim., ECF No. 36 ("Def. Mot."). The government opposed the defendant's requests. *See* Gov't Opp'n Def. Mot. in Lim., ECF No. 38 ("Gov't Opp'n"). On October 15, 2018, I issued an opinion and order granting the defendant's motions in part and requesting additional information from both parties. *See* Order on Mot. in Limine, ECF No. 40 ("Order on Mot."). I have reviewed the parties' supplemental materials, and for the reasons set forth below, the defendant's motion to admit the Bijoux store's copy of her duty-free receipt is granted, and the government's request to offer expert testimony is granted in part.

**A. The Bijoux store's copy of the duty-free receipt**

The defendant seeks to admit the Bijoux store's copy of her duty-free receipt under the foreign-records exception to the hearsay rule.[1] The foreign records exception states:

> In a criminal proceeding in a court of the United States, a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that—
>
> (A) such record was made, at or near the time of the occurrence of

---
[1] I assume familiarity with the case and the relevant motions in limine. For background, see Order on Mot.

1

> > the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;
>
> > (B) such record was kept in the course of a regularly conducted business activity;
>
> > (C) the business activity made such a record as a regular practice; and
>
> > (D) if such record is not the original, such record is a duplicate of the original;
>
> unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

18 U.S.C. § 3505(a)(1). The defendant's motion includes a foreign certification by Bijoux employee Balkis Stanton. *See* Def. Mot., Ex. B, ECF No. 36-2 ("Stanton Decl."). The certification states that Ms. Stanton is a "Warehouse Supervisor" who is "familiar with the records of duty-free sales to Bijoux customers, including how the records are kept by Bijoux." *Id.* After reviewing Ms. Stanton's certification, I was satisfied that it met the requirements of § 3505(a)(1)(B)-(D), but I requested additional information regarding Ms. Stanton's knowledge of Bijoux's bookkeeping procedures. *See* Order on Mot. 6 (noting that while § 3505(a)(1)(A) does not require the certifying witness to have personal knowledge of the actual creation of the business record, it does demand that she be familiar with the relevant recordkeeping procedures). On October 22, 2018, the defendant provided this court with a supplemental declaration by Ms. Stanton. *See* Def. First Suppl. Letter, Ex. A, ECF No. 44-1 ("Stanton Suppl. Decl."). The declaration states that as a "Warehouse Supervisor," Ms. Stanton receives two copies of each Bijoux receipt; that she "refer[s] to those [receipts] in supervising the packaging process, to ensure that stock removed from Bijoux's shelves are placed in the appropriate boxes"; and that it is Bijoux's regular business practice, under her supervision, to keep the copies of the receipts in

the warehouse records. *Id.* Ms. Stanton's supplemental declaration demonstrates sufficient familiarity with Bijoux's recordkeeping, and the requirements of § 3505(a)(1) are therefore met.

Under § 3505(c)(2), the foreign certification must be "made and signed in a foreign country by the custodian of a foreign record of regularly conducted activity or another qualified person that, if falsely made, would subject the maker to criminal penalty under the laws of that country." Ms. Stanton's declarations are certified by a Jamaican Justice of the Peace. *See* Stanton Decl.; Stanton Suppl. Decl. In my October 15 opinion and order, I requested additional information on the consequences of a declaration certified by a Justice of the Peace in Jamaica. *See* Order on Mot. 8. The defendant has submitted two affidavits by Debra Reid Archer, an attorney who has practiced in Jamaica for 26 years and is admitted to practice in both Jamaica and New York. *See* Def. First Suppl. Letter, Ex. B, ECF No. 44-2 ("Archer Aff."); Def. Second Suppl. Letter, Ex. A, ECF No. 47-1 ("Archer Suppl. Aff."). Ms. Archer states that Ms. Stanton's declaration is "of a proper form as required by Section 7 of the Voluntary Declarations Act of Jamaica" and that it "falls within the meaning of 'Voluntary Declaration' as defined by Section 2 of the Perjury Act of Jamaica and subjects [Ms. Stanton] to penalties for perjury within [Jamaica]." Archer Aff. (attaching copies of the Voluntary Declarations Act of Jamaica and the Perjury Act of Jamaica). Further, upon this court's request, Ms. Stanton submitted a supplemental affidavit explaining why Section 8 of the Voluntary Declarations Act of Jamaica does not impact the legal force of Ms. Stanton's declarations. *See* Archer Suppl. Aff. After reviewing Ms. Archer's affidavits and supplemental materials, I am satisfied that Ms. Stanton's declarations subject her to criminal penalties under Jamaican law. *See United States v. Chan*, 680 F. Supp. 521, 524 (E.D.N.Y. 1988) ("The court may take judicial notice of foreign law and legal terms under Rule 26.1 of the Federal Rules of Criminal Procedure, considering any relevant

source whether or not submitted by a party."). Thus, § 3505(c)(2)'s requirements are met, and the Bijoux store's copy of the duty-free receipt is admissible.

### B. The government's expert testimony

The defendant requests that expert testimony about the role of a courier in a drug-trafficking organization be precluded, while the government argues that this testimony is relevant and permissible. *See* Def. Mot. 6-7; Gov't Opp'n 8-9. After reviewing the parties' initial submissions, I determined that I did not have enough information to determine the admissibility of the expert's testimony, and I directed the government to provide a detailed description of the anticipated subject matter and support for why it is admissible. *See* Order on Mot. 10-11. On October 19, 2018, the government submitted a supplemental letter in response to my order. *See* Gov't Suppl. Letter, ECF No. 42. The government requests that its expert be permitted to testify about the following topics: 1) the methods of importing narcotics and the use of couriers by drug-trafficking organizations; 2) the characteristics that drug-trafficking organizations look for when recruiting couriers; 3) the ways that drug-trafficking organizations pay couriers; and 4) the techniques employed by drug-trafficking organizations to reduce the likelihood of being caught. The defendant opposes the expert's testimony. *See* Def. Resp. Gov't Suppl. Letter, ECF No. 48 ("Def. Resp."). I will address each topic in turn.

#### 1. The role of a courier

The government "plans to elicit testimony about the methods of importing narcotics, which includes the use of couriers by drug trafficking organizations." Gov't Suppl. Letter 1. "'[O]perations of narcotics dealers are a proper subject for expert testimony' when such is 'beyond the ken of a normal juror.'" *United States v. Denny*, No. 97-1485, 1998 WL 391104, at *1 (2d Cir. May 20, 1998) (first quoting *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir.

4

1991); then quoting *United States v. Cruz*, 981 F.2d 659, 664 (2d Cir. 1992)). Because the average juror is likely not familiar with the use and purpose of drug couriers, courts in this circuit have admitted expert testimony regarding the role of a courier. *See United States v. George*, No. 11-CR-250 (DLI), 2011 WL 2635808, at *2 (E.D.N.Y. July 5, 2011) (allowing a government expert in international drug trafficking to testify that "[w]hen smuggling large quantities of cocaine into the United States, narcotics traffickers routinely employ individuals to serve as couriers"); *United States v. Yevakpor*, 501 F. Supp. 2d 330, 334 (N.D.N.Y. 2006) (finding expert testimony about "issues concerning methods of importation and the role of drug mules" appropriate). Thus, the government's expert is permitted to testify about the method of importing narcotics through drug couriers.

2. **Characteristics**

The government also plans to elicit testimony from its expert about characteristics drug-trafficking organizations look for when recruiting couriers. *See* Gov't Suppl. Letter 2 ("Namely, drug trafficking organizations look for people that are low-profile, have no criminal record, have a legal right to travel, and fit within the normal flow of people entering the country, and thus are unlikely to be stopped."). As I noted in my October 15 opinion and order, while the government can have an expert testify about the use of couriers and common practices, the testimony must serve a purpose beyond simply "bolster[ing] the government's fact witnesses." *Denny*, 1998 WL 391104, at *1; *see also Cruz*, 981 F.2d at 663 (finding it "impermissible" for the government to "elicit[ expert] testimony from an officer as to various routine acts in drug transactions . . . and then argue[] that the defendants were guilty because the government's witnesses testified that the defendants [engaged in those routine acts]" (quoting *Castillo*, 924 F.2d at 1231)). In this case, the defendant has no criminal history and possesses a green card. *See* Mot. to Suppress 2, ECF

5

No. 18; SMILLER00059, at 11:05-11:55 ("Miller Post-Arrest Interview"), *enclosed in* Gov't Letter Significant Discovery, ECF No. 46. Thus, it appears that the government intends to elicit expert testimony that drug couriers routinely have no criminal record and the legal right to travel, and then argue that the defendant is guilty because she has no criminal record and the legal right to travel. This is precisely the type of expert testimony that the Second Circuit prohibited in *Castillo* and *Cruz*. The government relies on *Denny* and *George* to support its argument for admissibility. However, in those cases, the experts testified about characteristics of couriers "beyond the ken of a normal juror." *See Denny*, 1998 WL 391104, at *1 ("[A] jury simply cannot be expected to know that females in loose clothing make the best couriers."); *George*, 2011 WL 2635808, at *2 (agreeing with the government that the fact that the defendant's plane ticket was purchased one week in advance by another individual, that the defendant was in possession of two cell phones and a calling card, and that Trinidad is a known source country for cocaine "justif[ied] the admission of the expert's testimony" because these facts represented "methods of international drug trafficking . . . beyond the ken of the average jury"). This case is distinguishable from *Denny* and *George* because the average juror likely understands that drug traffickers would prefer couriers who are unlikely to be stopped for standing out or other legal reasons. If the government wishes to argue that the defendant's lack of criminal record and legal status make her an attractive courier, it may do so, but it does not require an expert to make that point. Thus, the government's expert is precluded from offering this proposed testimony.[2]

---

[2] As the defendant points out, the broad and vague nature of the government's proposed testimony also raises concerns. *See* Def. Resp. 2. While it is somewhat unusual to buy a last-minute plane ticket or carry multiple cell phones, most travelers have no criminal record and the legal right to travel. Further, it is unclear what it means to look "low-profile" or "normal." Thus, the proposed testimony provides limited assistance to the jury. *See id.*

### 3. Payment

The government's expert also plans to testify about "fees that couriers are typically paid for their services" and "how couriers may incur incidental travel expenses associated with their travel." Gov't Suppl. Letter 2. In *Denny*, the Second Circuit held that "[w]hile there is undoubtedly a common sense aspect to [the common practices relating to the use of couriers], a jury simply cannot be expected to know . . . the methods employed by dealers in paying couriers and reimbursing their expenses." 1998 WL 391104, at *1. Thus, the court concluded, the expert's testimony was admissible because it did more than simply "bolster the government's fact witnesses." *Id.*; *see also Yevakpor*, 501 F. Supp. 2d at 333 (finding it proper for the government's expert to testify about "the ways in which transporters receive compensation, and how they incur incidental expenses associated with the transportation" (quoting *United States v. Yevakpor*, 419 F. Supp. 2d 242, 254 (N.D.N.Y. 2006)). Because the methods of paying and reimbursing couriers are beyond the ken of the average juror, the government's expert is permitted to testify about such methods.[3]

### 4. Techniques to evade detection

Lastly, "the government plans to elicit testimony about the techniques employed by drug trafficking organizations to reduce the likelihood that couriers, if caught, will expose co-conspirators." Gov't Suppl. Letter 2. Specifically, the government expects its expert to testify that "couriers sometimes avoid carrying an electronic device or use multiple devices because such devices can be the source of evidence connecting them to co-conspirators." *Id.* at 2-3. The

---

[3] The defense argues that it is problematic for the government's expert to testify that couriers sometimes pay for their own travel expenses. *See* Def. Resp. 1-2 (noting that "the typical courier has their ticket paid for them, usually in cash" and that "[t]he fact that Ms. Miller paid for her own flight (which she did) does not make her more likely a knowing courier—it simply means she paid for her flight, as most people do"). Because methods of paying and reimbursing couriers are beyond the ken of the average juror, they are an appropriate topic for expert testimony. However, to the extent that the defendant's behavior does not align with that of a typical courier, the defense is free to demonstrate that point through cross-examination and other evidentiary support.

7

government argues that it is beyond the ken of the average juror that law enforcement relies on the phones of couriers to investigate courier cases. *Id.* at 3. Thus, it claims that "[b]y extension, the calculated efforts by drug trafficking organizations to thwart such investigative techniques are also beyond the ken of the average juror." *Id.* The cases cited by the government support its argument that expert testimony on this topic is admissible. *See George*, 2011 WL 2635808, at *3 ("Particularly where, as in this case, Defendant asserts that the sole contested issue at trial will be Defendant's knowledge that his suitcase contained drugs, expert testimony that provides background information concerning the international drug trade and the common techniques used by drug couriers to avoid detection by authorities will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" (quoting Fed. R. Evid. 702)); *see also Yevakpor*, 501 F. Supp. 2d at 333 ("It is well established that experienced narcotics agents may explain the use and meaning of codes and jargon developed by drug dealers to camouflage their activities . . . ." (internal quotation marks and citation omitted)). In *George*, the defendant was in possession of two cell phones and a calling card, and the court allowed the government's expert to testify that "[t]hose involved in the international narcotics trade commonly use multiple cell phones and calling cards when communicating with drug traffickers in order to hide their identities from authorities." *George*, 2011 WL 2635808, at *2. The court reasoned that the testimony would "provide context for the jury" and "assist them in assessing the totality of the circumstances," because "methods of international drug trafficking [are] beyond the ken of the average jury." *Id.* The defendant in this case did not have a cell phone with her and could not recall her phone number. *See* Miller Post-Arrest Interview, at 9:48-10:15. Thus, expert testimony that couriers sometimes avoid carrying an electronic device in order to protect co-conspirators is

8

admissible, because it is both beyond the ken of the average jury and relevant to the government's case.[4]

## CONCLUSION

For the reasons stated in this opinion, the defendant's motion to admit the Bijoux store's copy of her duty-free receipt is granted. Further, while the government's expert is permitted to testify about the role of a courier, common methods of paying and reimbursing couriers, and techniques used by drug-trafficking organizations to avoid detection, the expert is precluded from testifying about the characteristics drug traffickers look for when recruiting couriers.

SO ORDERED.

                                                                                                /s/_____
                                                      Allyne R. Ross
                                                      United States District Judge

Dated:    November 2, 2018
             Brooklyn, New York

---

[4] The defendant argues that the expert's testimony is irrelevant because it does not make it more likely that someone who carries no device with them – like Ms. Miller – is a knowing courier. *See* Def. Resp. 1. However, if carrying no device is a method that couriers use to protect co-conspirators, and an individual caught with drugs is carrying no device, it is more likely that that individual is trying to protect a co-conspirator, which makes it more likely that that individual has knowledge of wrongdoing.